# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
July 14, 2009 Session

## STATE OF TENNESSEE v. VARIO TALLY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-08519     Chris Craft, Judge**

---

**No. W2008-01136-CCA-R3-CD   -   Filed December 8, 2009**

---

The defendant, Vario Tally, was convicted of aggravated robbery and carjacking, both Class B felonies, and sentenced as a Range II, multiple offender to eighteen years and twenty years, respectively. The trial court ordered that the sentences be served consecutively for a total effective sentence of thirty-eight years. On appeal, he argues that the proof was insufficient to sustain the conviction for aggravated robbery and that the trial court erred in imposing consecutive sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Gerald S. Green (on appeal) and Joshua B. Spickler (at trial), Memphis, Tennessee, for the appellant, Vario Talley.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Colin A. Campbell and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant and a co-defendant were convicted of aggravated robbery for their theft of cigarettes from a Mapco store and of carjacking a truck from the parking lot to make their escape.

Sam Ajami testified that he was employed as a loss prevention specialist by Mapco Express and that, at the time of the incidents charged in the indictment, he was a Mapco district manager. He identified a DVD and a videotape bearing the date of August 16, 2004, both from surveillance equipment at the Mapco located at 6127 Stage Road in Bartlett.

Eddie Scallions testified that he was an investigator with the Office of the Shelby County District Attorney General and identified a photograph which he had taken of a tattoo on the defendant's neck.

Lisa Marie Allen testified that on August 16, 2004, she was employed as a fill station clerk at the Mapco Express on Stage Road in Bartlett. She said that a man wearing a sports jersey bearing the number 5 entered the store that day, purchased lottery tickets, went outside to scratch the tickets to see if they were winners, and came back inside to redeem the tickets. She said that the man wearing the jersey came in and out of the store "a couple" of times and that she paid attention to him for about fifteen minutes and was "[c]ounter space close" to him. He had a tattoo on the right side of his neck that said "Love Maria" or "Marina." She identified the defendant from a photospread and in the courtroom as the assailant with the tattoo.

Allen said that there was a store room in the Mapco store, which contained cigarettes packed in cartons. There were "maybe a hundred cartons" which sold for $21.94 each at the time. As she was redeeming the lottery tickets for the man wearing the jersey, she heard a noise from the store room, looked into the room, and saw "a black guy standing there with the white shirt on." She said that the man in the store room was putting cartons of cigarettes into pillowcases. She asked what he was doing and "then he pull[ed] a gun out at [her] and said . . . that if [she] did anything or said anything he would shoot to kill [her]." She said that she "started screaming[,] telling him to get out." He then "manhandled her," shoving her against an ice bin, and she "blacked out just for a moment." She said that she "grew up in the Marine Corps" and had been "around guns a lot." She described her assailant's pistol as black "like a Glock 9 [millimeter]." She said that, when he threatened her, she was "[p]retty well shook up and scared as hell." As the man left with the cigarettes, she ran after him, yelling, and went as far as the front door of the store. She got a hand on one of the pillowcases at the front door, and another customer tried to help her. The assailants "kept on saying, 'Shoot him. Shoot him,'" so they let go of the pillowcase. She said there were four pillowcases which would have held more than fifty cartons of cigarettes.

Chad Adams testified that he was employed as an electrician at Ellendale Electric Company. He said that August 16, 2004, was the first day he had attended International Electrical College, which was located behind the Mapco store in Bartlett. He was in a truck with Matt Mestemacher, with whom he was attending school. They went to the Mapco store to buy drinks for a break they had from classes. He said the parking lot was empty as they drove into it. Adams said that, as he entered the store, he heard "some rustling in the background and . . . a woman screaming Help, help." He said that "she was being drug by the bags." He "grabbed onto the bag [and] asked the fellow where he was going."

Adams said that two men were involved, one appeared to be the lookout and the other came from behind the cash register. He said that they got into a tug-of-war over the bags, but he let go after one of the men said, "Shoot him, shoot him." The men left with the bags, got into Mestemacher's truck, and drove "very quickly" west on Stage Road toward Covington Pike. Adams

said that he did not have a gun and did not see either of the men with one. Mestemacher stayed outside to telephone his mother to inform her that his truck had been stolen.

Charles Matt Mestemacher testified that he was an electrician, employed by Ellendale Electric Company, and on August 16, 2004, was attending school at International Electrical College, located behind the Mapco Express in Bartlett. He said that Chad Adams rode with him to the Mapco store, and he waited in his truck while Adams went inside. Three or four minutes later, an African-American man ran out of the Mapco store and told Mestemacher to get out of his truck or he would be shot. He said that the man who got into the driver's seat threw some bags into the back of the truck, and another man got in the passenger's seat. Mestemacher jumped out of his truck, and the two men drove away. He acknowledged that neither man pulled a gun on him.

Lieutenant Christopher Page of the Bartlett Police Department testified that he responded to an armed robbery call at the Mapco on Stage Road on August 16, 2004, at approximately 7:00 p.m. He spoke to Lisa Allen and viewed the surveillance video at the store. Lieutenant Page said that the defendant captured his attention the most on the videotape because of the clothing he was wearing, a "Nets jersey, red ball cap, number five." He said that the defendant's fingerprint was found on a pay phone outside the Mapco and that Ms. Allen identified the defendant from a photospread on August 20, 2004. Lieutenant Page said he collected into evidence nine cartons of cigarettes from the Mapco store room which were processed for latent prints.

Robert Davis, an AFIS[1] specialist with the Shelby County Sheriff's Department and accepted by the trial court as an expert in the field of fingerprint identification, testified that his examination of the defendant's latent fingerprint and the fingerprint lifted from the pay phone at the Mapco revealed that they were a match.

The defendant elected not to testify and rested his case without presenting any proof.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant asserts that the trial court erred in denying his motion for judgment of acquittal as to the aggravated robbery because, in his view, there was no proof that he possessed a firearm during the robbery; proof was "scant" that his co-defendant possessed a weapon; and the proof showed that he was outside the store "when the actual taking occurred in a back storage/inventory room of the store." The State responds that the evidence was sufficient to sustain the conviction for aggravated robbery.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

---

[1]Davis testified that AFIS stands for "Automated Fingerprint Identification System."

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Robbery is defined by Tennessee Code Annotated section 39-13-401(a) as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Aggravated robbery is defined, in pertinent part, by section 39-13-402(a) as robbery which is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the acts of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

In this appeal, the evidence, taken in the light most favorable to the State, showed that the defendant and a co-defendant together entered the Mapco store and, as the defendant diverted the attention of the clerk, the co-defendant, in a storage room, began loading cartons of cigarettes into a pillowcase. The co-defendant exhibited a firearm to the victim, and the defendant struggled with her as he and the co-defendant left the store with the cigarettes. They then carjacked a truck in front of the store and left together. The store clerk identified the defendant as one of the robbers. From this proof, we conclude that a rational jury could have found the defendant guilty of aggravated robbery.

## II. Sentencing

The defendant was sentenced as a Range II, multiple offender to eighteen years for the aggravated robbery and to twenty years for the carjacking, the court ordering that the sentences be served consecutively. The defendant argues that the court erred in imposing consecutive sentencing, and the State responds that such sentencing was appropriate. We will review these arguments.

The trial court conducted a thorough sentencing hearing, explaining in detail why the court determined that the defendant was a professional criminal and a dangerous offender and why he must be incarcerated for a lengthy period of time to protect society:

> Looking at concurrent, consecutive factors, [the defendant] was 28 years old and according to the Presentence Report . . ., he has never worked. I find that he is even at age 28, a professional criminal [who has] knowingly devoted such defendant's life to criminal acts as a major source of livelihood. He doesn't have that much of a life at 28, but he's never worked and apparently just robs and steals. I also find that at age 28 that already he's an offender whose record of criminal activity is extensive.

> I also find that he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high and find all three of these factors. The circumstances surrounding the commission of this offense are aggravated, in that, it's not just an aggravated robbery but it's one done during broad daylight where two persons descend on this store, rob it, and then highjack another car right outside the door to get away with [the defendant] threatening or asking that the victim be killed or shot and then I believe the allegation is that outside in the carjacking that that person would be killed unless they gave the car up.

> I also find that confinement for an extended period of time is necessary to protect society from this man because he's unwilling to lead a productive life and he resorts to criminal activity in furtherance of his anti-societal life-style. If these sentences were run consecutively, he would have 38 years in the Tennessee Department of Corrections . . . at 35 percent parole eligibility which would mean he would be eligible for asking for parole after serving approximately one-third of this sentence and would still be a fairly young man if he received parole. Under the circumstances of these two crimes being similar to every other crime he has committed in his life, I also find that the aggregate length of the sentence, 38 years[,] reasonably relates to the offense that he stands convicted.

> So I'm, thereby, sentencing [the defendant] to 18 years on the aggravated robbery, 20 years [on] the carjacking and ordering that they be served consecutively for a total of 38 years in the Tennessee Department of Corrections.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d)

-5-

(2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

The defendant argues, as we understand, that the trial court erred in determining that he was a dangerous offender and a professional criminal. As we will explain, we respectfully disagree with this argument. According to the presentence report, the defendant has never been employed, although he was twenty-seven years old when the report was prepared. The trial court discussed his lengthy history of arrests and convictions. We note that, at age sixteen, he was convicted of three aggravated robberies and sentenced to eight years for each. In 2004, at age twenty-four, he was convicted of two counts of "fac[ilitation of] aggravated robbery" and sentenced to six years for each. The gaps between his arrests appear to be due to the fact that that he had two lengthy periods of incarceration. It is abundantly clear, as the trial court determined, that the defendant is both a dangerous offender and one who has chosen committing crimes as his vocation. Accordingly, we affirm the consecutive sentencing.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE